**ALBERTA GAS CHEMICALS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 79–8–01295.**

United States Court of International Trade.

May 28, 1981.

Freeman, Meade, Wasserman & Schneider, New York City, for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., David M. Cohen, Director, Commercial Litigation Branch, New York City, and Sheila N. Ziff, New York City, trial atty., for defendant.

*On Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.*

NEWMAN, Judge.

Plaintiff, an importer of methyl alcohol (also known as methanol) from Canada, contests the exclusion of its merchandise from entry by the Regional Commissioner of Customs at the port of New York. Presently before the Court are defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment.

### I.

The material facts, undisputed, are:

1. On May 2, 1978 the United States Treasury Department ("Treasury") received information in proper form pursuant to the applicable Customs regulations (19 CFR §§ 153.26 and 153.27) from E. I. du Pont de Nemours and Company alleging that methyl alcohol from Canada was being, or is

likely to be, sold at less than fair value ("LTFV"); and that such sales were causing, or are likely to cause, injury to an industry in the United States within the meaning of section 201(a) of the Antidumping Act of 1921, as amended (19 U.S.C. § 160(a)).

2. On June 8, 1978 Treasury initiated an antidumping investigation, and on June 14, 1978 the required Antidumping Proceeding Notice appeared in the *Federal Register* (43 FR 25758).

3. A "Witholding of Appraisement Notice" was published in the *Federal Register* of December 19, 1978 (43 FR 59196).

4. On March 23, 1979 Treasury determined that methyl alcohol from Canada was being sold in the United States at LTFV within the meaning of the Antidumping Act of 1921, as amended, and that the dumping margins ranged from 9.9 percent to 108.6 percent, with a weighted average margin of 59.2 percent. That determination was published in the *Federal Register* on March 30, 1979 (44 FR 19090).

5. On June 29, 1979 the United States International Trade Commission ("Commission") by a three to two vote determined in Investigation AA 1921–202 that the domestic methyl alcohol producing industry was likely to be injured by reason of the importation of methyl alcohol from Canada which Treasury had determined was being, or was likely to be, sold at LTFV. The Commission's determination was published in the *Federal Register* on July 12, 1979 (44 FR 40734).

6. On July 23, 1979 Treasury issued a Finding of Dumping respecting methyl alcohol from Canada (TD 79–210), which finding was published in the *Federal Register* on July 27, 1979 (44 FR 44154).

7. The subject merchandise was exported from Canada on August 13, 1979 and imported into the United States on the same day. Entry documents (Consumption Entry No. 79–638078–8) and a check for estimated duties were presented by plaintiff to the appropriate Customs officer at the port of New York on August 15, 1979. However, plaintiff was not permitted by Customs to enter its merchandise without posting an antidumping bond (in accordance with 19 U.S.C. § 167 and 19 CFR § 153.50), which plaintiff refused to proffer.

8. On August 15, 1979 the imported merchandise was assigned General Order No. 110–79 and stored in a warehouse.[1]

## II.

Following the denial of its administrative protest on August 17, 1979, plaintiff commenced the present action alleging that the Regional Commissioner excluded its merchandise from entry and refused to deliver the subject merchandise without the filing of an antidumping bond.

The complaint contests the exclusion of plaintiff's merchandise from entry and delivery "and the legality of all orders and findings of the United States International Trade Commission and of the Secretary of the Treasury entering into the Regional Commissioner's decision". In this connection, plaintiff alleges that the sole ground for the exclusion of the subject merchandise from entry was that plaintiff did not file an Antidumping Bond; and that the sole ground for the Regional Commissioner's demand for a bond was the Secretary's Finding of Dumping. Continuing, the complaint alleges that the Regional Commissioner erred in demanding, under section 208 of the Antidumping Act of 1921, as amended (19 U.S.C. § 167), the posting of an Antidumping Bond (Customs Form 7591), and in excluding the merchandise from entry and delivery to plaintiff in the absence of such bond; that the Secretary's Finding of Dumping is illegal, *ultra vires*, null and void; and that plaintiff is entitled to the entry and delivery of its merchandise with-

---

1. On August 13, 1980 plaintiff brought on an order to show cause why sale of General Order merchandise should not be enjoined, *pendente lite*; and pursuant to the "All Writs Act" (28 U.S.C. § 1651(a)) this Court entered an order on September 22, 1980 enjoining the sale or disposition of the merchandise *pendente lite*. *Alberta Gas Chemicals, Inc. v. United States*, 85 Cust.Ct. ——, C.R.D. 80–13, 496 F.Supp. 1332 (1980).

out the submission of an Antidumping Bond because no legal and valid Finding of Dumping covers the merchandise. The complaint then sets forth three causes of action, each of which controverts some phase of the antidumping proceedings leading to the Secretary's Finding of Dumping, including the Secretary's LTFV investigation and determination, and the subsequent affirmative determination by the Commission of likelihood of injury. The relief sought by plaintiff in its complaint is an adjudication that the Secretary's Finding of Dumping is illegal, null and void; that the Antidumping Act of 1921 is therefore inapplicable to exportations of methyl alcohol from Canada; and an order that the Regional Commissioner accept plaintiff's entry and deliver the merchandise to plaintiff without filing an antidumping bond. The complaint does not challenge the assessment of any duty nor seek a refund.

Defendant's prior motion to dismiss the action or alternatively for summary judgment was denied by this Court on January 17, 1980. *Alberta Gas Chemicals, Inc. v. United States*, 84 Cust.Ct. ——. C.R.D. 80–1, 483 F.Supp. 303 (1980). There, it was determined that pursuant to 28 U.S.C. § 1582(a)(4) this Court has jurisdiction to determine the legality of the exclusion of plaintiff's merchandise from entry for refusal to file an antidumping bond, and the Secretary's underlying finding of dumping. Defendant's alternative motion for summary judgment was held to be premature under Rule 8.2(a) inasmuch as defendant had not then filed an answer. Defendant has

since filed its answer to the complaint, and has renewed its motion for summary judgment, which is presently before the Court.

I have concluded that defendant's motion for summary judgment should be denied and plaintiff's cross-motion for summary judgment should be granted.

### III.

Under section 201(c)(1) of the Antidumping Act of 1921, as added by section 321(a) of the Trade Act of 1974, Pub.L. 93–618, 88 Stat. 1048, effective January 3, 1975 and in effect prior to January 1, 1980, Treasury was required to determine whether to initiate an investigation into the question of whether imported merchandise is being, or is likely to be, sold in the United States or elsewhere at LTFV within thirty days after receipt of specified information.[2] There is no dispute that Treasury received the appropriate information concerning the alleged dumping of methyl alcohol from Canada on May 2, 1978, and did not determine to initiate an investigation until June 8, 1978 (complaint and answer, paragraphs 30 & 35).

Plaintiff, relying heavily upon the legislative history of the 1974 amendment to the Antidumping Act which established the thirty day time limitation in section 201(c)(1),[3] and the subsequent legislative history of the Trade Agreements Act of 1979 (which repealed the Antidumping Act of 1921 and replaced it with an entirely new antidumping statute),[4] maintains that the

---

**2.** Section 201(c)(1) (19 U.S.C. § 160(c)(1) (1975)), so far as pertinent reads: "(c)(1) The Secretary shall, within thirty days of the receipt of information alleging that a particular class or kind of merchandise is being or is likely to be sold in the United States or elsewhere at less than its fair value and that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States, determine whether to initiate an investigation into the question of whether such merchandise in fact is being or is likely to be sold in the United States or elsewhere at less than its fair value. If his determination is affirmative he shall publish notice of the initiation of such an investiga-

tion in the Federal Register. If it is negative, the inquiry shall be closed."

It should be observed that the Customs Regulations (19 CFR § 153.29) similarly impose a time limitation on publication with respect to initiation of an antidumping investigation.

**3.** H. R. Rep. No. 571, 93rd Cong., 1st Sess. 68 (1973); S. Rep. No. 1298, 93rd Cong., 2d Sess. 170 (1974), U.S.Code Cong. & Admin.News 1974, p. 7186.

**4.** S. Rep. No. 249, 96th Cong., 1st Sess. 61, 63 (1979), U.S.Code Cong. & Admin.News 1979, p. 381.

Section 732(c) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979

time limitation is mandatory. Accordingly, plaintiff argues, Treasury lacked authority to act on the dumping complaint after the expiration of the thirty day period, and all antidumping proceedings directed against methyl alcohol from Canada were *ultra vires* and void.

Citing certain decisions of the federal Courts of Appeals construing similar statutory time limitations, defendant insists that the time limitation in section 201(c)(1) is not mandatory, but merely directory.

After careful consideration of the legislative history cited by plaintiff and the judicial precedents relied upon by defendant, I conclude that defendant's position is well taken. It is settled that "[a] statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period *and specifies a consequence for failure to comply with the provision*" (emphasis added). *Usery v. Whitin Machine Works, Inc.*, 554 F.2d 498, 501 (1st Cir. 1977); *Fort Worth National Corporation v. Federal Savings and Loan Insurance Corporation*, 469 F.2d 47, 58 (5th Cir. 1972). *Accord: Diamond Match Co. v. United States*, 44 Cust.Ct. 67, 74–75, C.D. 2154, 181 F.Supp. 952, 958–59 (1960), *aff'd*, 49 CCPA 52, C.A.D. 796 (1962).

In *Usery*, at page 501, the Court of Appeals commented:

The first question before us is whether the Act[5] was properly construed as ousting the Secretary [of Labor] of jurisdiction to make an eligibility determination [for worker adjustment assistance] after 60 days had passed following the filing of the petition. We observe that the statute does not specifically address this question. Although Congress clearly desired the expeditious treatment of such petitions, there is nothing in the statute which in any way suggests that the time limitation was designed to be jurisdictional. The Act neither purports to restrain the Sec-

retary from acting after 60 days have passed nor specifies that any adverse consequences follow from the Secretary's failure to comply. In the absence of any such clear indications of Congressional intent that the limitations are to be strictly enforced, courts have uniformly held that the time requirements in statutes such as the one in the case at bar are not jurisdictional.

■ Similarly, in the present case the statute (section 201(c)(1)) does not specifically address the question of Treasury's jurisdiction to make a determination after the expiration of the thirty day time period. Although the legislative history cited by plaintiff shows clearly that Congress desired the expeditious handling of dumping complaints and the timely determination of whether an antidumping investigation should be initiated, to borrow from the Court's language in *Usery* "there is nothing in the statute which in any way suggests that the time limitation was designed to be jurisdictional". Further, "[t]he Act neither purports to restrain the Secretary [of Treasury] from acting after [30] days have passed nor specifies that any adverse consequences follow from the Secretary's failure to comply". *Ibid.* Here, as in *Usery*, "such clear indications of Congressional intent that the limitations are to be strictly enforced" are absent.

■ Plaintiff, however, contends that section 201(c)(1) meets the criteria of a mandatory statute for the reason that Congress specified that the inquiry was to be "closed" at the end of the thirty day period if no investigation had been initiated. Such a construction of the statute is plainly a distortion. Indeed, Section 201(c)(1) reads in pertinent part:

If his [the Secretary's] determination is affirmative he shall publish notice of the initiation of such an investigation in the

(19 U.S.C. § 1673a(c) (1980)) reduced the time limit for making a determination from 30 to 20 days.

5. The statute involved, 19 U.S.C. § 2273(a), provides that the Secretary of Labor shall de-

termine eligibility for adjustment assistance "[a]s soon as possible after the date on which a petition is filed under section 2271 of this title, *but in any event not later than 60 days after that date.*" [Emphasis added.]

Federal Register. *If it is negative, the inquiry shall be closed.* [Emphasis added.]

■ As may be seen, the statute provides that the inquiry shall be closed, not as a consequence of the Secretary's failure to make a determination within a specified time, *but only if the Secretary's determination is negative.* It logically follows, therefore, that until such negative determination is made, the inquiry remains open. There is nothing in the provision which remotely suggests that the inquiry is automatically closed at the end of the thirty day period if no determination has been made to initiate an investigation, as urged by plaintiff. The closing of the inquiry upon a negative determination was intended neither as a penalty nor as an adverse consequence, but merely to give finality to the investigation so that the complaining or other domestic producer would then, upon notification of termination, have an opportunity to challenge the Secretary's negative determination.

■ While admittedly the purpose of the amending provisions of the Trade Act of 1974 respecting the thirty day time limitation was to expedite antidumping proceedings, it is difficult to believe that Congress could have intended to penalize the complaining domestic producer and deny it the protection afforded by the Antidumping Act solely because of "administrative foot-dragging"[6]. *Cf. Usery*, 554 F.2d at 502. Surely, such result would completely thwart the very purpose of the 1974 amendment.

■ Although Treasury's failure in this case to comply with the statutory time limit is not condoned, I am constrained to hold that Treasury was not ousted of jurisdiction by reason of its failure to make a determination to initiate an investigation within the thirty day time period specified in section 201(c)(1). Accordingly, I conclude that Treasury's determination to initiate an investigation eight days after the expiration of the thirty day time period and its subsequent action in the antidumping proceedings was not *ultra vires*, as urged by plaintiff.

IV.

We turn to plaintiff's claim that Treasury's LTFV determination (44 FR 19090) is arbitrary, unreasonable and contrary to law. Specifically, plaintiff asserts that in computing dumping margins Treasury improperly compared the prices of Alberta Gas Chemicals, Limited (AGCL) to United States co-producers with AGCL's prices to Canadian formaldehyde producers, without adjustment for the difference in the commercial level of trade and in disregard of the contemporaneous and more comparable sales by AGCL to a third country co-producer, thus producing an unreasonable weighted average margin of dumping.[7]

Defendant contends that 19 CFR § 153.15 precludes the use of third country sales as a basis for making level of trade comparisons for fair value purposes. In making price comparisons, sales to United States co-producers were compared with sales in the home market to producers of formaldehyde

---

6. Congressional dissatisfaction with Treasury's administration of the Antidumping Act is a matter of public record. H.R.Rep.No. 96–317, 96th Cong., 1st Sess. 69; S.Rep.No. 96–249, 96th Cong., 1st Sess. 76–77. On January 1, 1980, the new antidumping law (contained in the Trade Agreements Act of 1979, Public Law 96–39) became effective; and on January 2, 1980, Treasury's responsibility for the administration of that law was transferred to the Commerce Department by the President's Reorganization Plan No. 3 of 1979 (44 FR 69275 and 45 FR 9931).

7. "The investigation by the Department of the Treasury of the pricing of methyl alcohol

imported from Canada covered the 6-month period from January 1, 1978, through June 30, 1978. The investigation was limited to sales by Alberta Gas Chemicals Limited (AGCL), which accounted for virtually all imports of methyl alcohol from Canada. Fair value comparisons were made on approximately 72 percent of the sales of the subject merchandise, and dumping margins ranging from 9.9 percent to 108.6 percent were found on all the sales compared. The weighted average margin of dumping as determined by the Department of the Treasury was 59.2 percent." 44 FR 40735 (1979). See section I, paragraph 4 of this opinion.

because there were no sales of methyl alcohol by AGCL to co-producers in Canada. Thus, the Notice of Determination states, in pertinent part (44 FR 19091):

Respondent maintained that sales to a third-country co-producer should be used as the basis for comparing prices to U.S. co-producers or, in the absence of that, the price differential on AGCL's sales in the U.S. to co-producers and sales to producers of formaldehyde be used for establishing the adjustment to the home market price. Georgia-Pacific Corp., a U.S. co-producer, also maintained that third-country experience should be used, or that, in the alternative, adjustments be made for volume discounts pursuant to § 153.9 of the Customs Regulations (19 CFR 153.9) or for circumstances of sale, pursuant to § 153.10 (19 CFR 153.10).

Treasury's consistent interpretation of § 153.15 of the Customs Regulations (19 C.F.R. 153.15) has precluded the use of third-country sales as a basis for making level of trade comparisons for fair value purposes. Moreover, the Department has not considered sales at different levels of trade in the U.S. as an appropriate basis for adjustments in calculating fair value. Nevertheless, the Treasury has in the past considered claims for quantity discounts or differences in circumstances of sale, to the extent the requirements for such adjustments can be satisfied, which have reached results comparable to a "level of trade" adjustment. Where price differences result from differences in the levels of trade being served, and the cost of those differences can be quantified by reference to verified added costs incurred due to different marketing practices in the foreign market under examination, an adjustment will be considered. However, in this case no actual quantification of such differences was presented. Accordingly, the Department has used sales at the nearest comparable level of trade, in this case sales to producers of formaldehyde, for the purposes of comparison with sales to co-producers in the United States.

Continuing, the Notice of Determination states:

In prior cases, the Department has noted that adjustments for differences in level of trade cannot always be accounted for satisfactorily by adjustments for differences in circumstances of sale and quantity discounts. Since the issue here is a fundamental one, affecting many cases, it is deemed inadvisable to depart from consistent prior practice until a thorough review of the issue has been completed and any changes to that practice implemented through a formal rulemaking process.

Respondent made a claim for adjustment for differences in quantities relative to sales to one large U.S. producer of formaldehyde. Since adequate documentation was not provided pursuant to § 154.9 of the Customs Regulations to justify such an adjustment, that claim was disallowed.

The Antidumping Act of 1921 did not define the term "fair value" as used in 19 U.S.C. § 160(a)—the basis for determining dumping margins—nor did the statute indicate a method for calculating such margins. Treasury, however, issued regulations implementing the statute by prescribing the methods for determining "fair value" and calculating dumping margins (19 CFR §§ 153.1–153.18). Sections 153.3(a) and 153.15 of the Customs Regulations (19 CFR §§ 153.3(a) and 153.15), pertinent to the present issue, read:

§ 153.3 Fair value based on sales for exportation to countries other than the United States.

(a) *General.* If it is demonstrated, in a situation other than that provided for in § 153.4, that during a representative period the quantity of such or similar merchandise sold for consumption in the country of exportation is nonexistent or so small, in relation to the quantity sold for exportation to countries other than the United States, as to be an inadequate basis for comparison, then merchandise imported into the United States ordinarily will be deemed to have been sold, or to be likely to be sold, at less than fair value

if the purchase price or the exporter's sales price (as defined in sections 203 and 204, respectively, of the Act (19 U.S.C. 162, 163)), as the case may be, is, or is likely to be, less than the price (as defined in section 205, after adjustment as provided for in section 202 of the Act (19 U.S.C. 164, 161)), at which such or similar merchandise (as defined in section 212(3) of the Act (19 U.S.C. 170a(3)), is sold for exportation to countries other than the United States on or about the date of purchase or of agreement to purchase the merchandise imported into the United States if purchase price applies, or on or about the date of exportation thereof if exporter's sales price applies.

§ 153.15 Fair value; level of Trade.

The comparison of the purchase price or exporter's sales price (as defined in sections 203 and 204, respectively, of the Act (19 U.S.C. 162, 163)), as the case may be, with the applicable price in the home market of the country of exportation (or, as the case may be, the price to or in third country markets) generally will be made at the same commercial level of trade. However, if the Secretary finds that the sales of the merchandise to the United States or in the applicable foreign market at the same commercial level of trade are insufficient in number to permit an adequate comparison, the comparison will be made at the nearest comparable commercial level of trade and appropriate adjustments will be made for differences affecting price comparability.

■ Under the foregoing regulations, plainly sales to third countries are intended to be utilized in computing dumping margins only as a secondary or residual basis of comparison when the quantity of merchandise sold in the country of exportation is non-existent or so small as to be an inadequate basis of comparison.

■ Conceding "that the Treasury Department followed its regulations", plaintiff nonetheless asserts that had Treasury compared AGCL's prices to United States co-producers with the prices to a third country co-producer, the weighted average margin of dumping would have been substantially lower.[8] While it is arguable that Treasury should have adopted a regulation permitting the use of third country sales as a basis for making level of trade comparisons for fair value purposes, and plaintiff's argument has a certain superficial appeal, I find (and as noted above, plaintiff concedes) that Treasury followed its existing regulations. Normally, Treasury Regulations must be sustained unless they are unreasonable and plainly inconsistent with statute. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). I see no basis in this case, however, for holding that the regulations challenged by plaintiff are either unreasonable or contrary to the Antidumping Act.

The following decisions of the Supreme Court relied upon by plaintiff have been noted, but found inapposite: *United States v. Cartwright*, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973) involved the validity of a Treasury regulation concerning the valuation for purposes of the Federal Estate Tax of mutual fund shares on the basis of asked prices in the public market. *De Sylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) involved a certain practice of the Copyright Office.

As respects plaintiff's assertion that Treasury allowed no adjustments, Treasury's Notice of Determination indicates that while Customs would consider adjustments, AGCL did not present adequate claims. Customs, therefore, proceeded to compare sales to United States co-producers with unadjusted sales to Canadian formaldehyde producers.

■ In brief, plaintiff has failed to establish any invalidity in the price comparisons utilized in the subject LTFV investigation, and the dumping margins determined by Treasury are valid and were arrived at in accordance with the regulations.

---

**8.** The actual differences in the margins were *submitted by plaintiff in a Confidential Memorandum.*

## V.

Finally, we reach plaintiff's claim that the Commission's injury determination is erroneous as a matter of law, and without a rational basis in fact. As noted *supra*, three of the Commissioners determined that the United States methanol-producing industry is likely to be injured by reason of the LTFV sales, while two Commissioners dissented.[9]

█ It is now settled under the statutes applicable in this case that judicial review is upon the record made before the Commission; and "the sole standard of review of factual determinations of injury or likelihood of injury in antidumping cases [is] whether the Commission's determination is supported by substantial evidence." *See Armstrong Bros. Tool Co. et al. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 67 CCPA ——, C.A.D. 1252, 626 F.2d 168 (1980), and cases cited therein.

I find, after careful consideration of the record before the Commission, that the majority's determination of likelihood of injury is not supported by substantial evidence, and I agree with the well reasoned Statement of dissenting Commissioners Alberger and Stern.

The majority of the Commission found that significant dumping margins (as determined by Treasury) on the LTFV imports from Canada had suppressed U.S. producer prices and that there was a sharply deteriorating trend in the profitability of the domestic industry since 1976. Moreover, the majority found that the declining trend in profitability was the result of rapidly increasing production costs (primarily those for natural gas) without corresponding increases in selling prices, and that the domestic industry was increasingly vulnerable to injury from the LTFV imports. The majority concluded that "continued sales at less than fair value of *expanding supplies* from Canada will suppress or depress U.S. producers' prices and will be almost certain to cause injury to the U.S. industry". (Emphasis added.)

The majority's finding concerning *expanding* supplies was based upon the possibility that AGCL might, at some future time, construct new production facilities. Thus, the Commission's majority stated (44 FR 40735):

In July 1976, AGCL obtained approval from the Energy Resources Conservation Board of Alberta to use natural gas as a raw material in the production of methyl alcohol which would be produced in two additional facilities to be constructed at the Medicine Hat, Alberta site. * * * Although AGCL has not made a final determination on whether to proceed with this construction, the outcome of this investigation conceivably may be a factor in the final decision. If AGCL is permitted to continue to sell at LTFV in this market and the additional capacity under consideration is brought into being, about 700 million pounds of methyl alcohol will be available for export to the United States. The additional supply is the equivalent of more than 10 percent of current U.S. consumption. The U.S. market is a logical market for any increased Canadian production.[10]

9. In its reply memorandum (p.1), defendant states that the dissenting Commissioners did not find, nor even comment, concerning present injury. That statement is incorrect, since a substantial portion of the dissenting statement is focused on that very determination (viz., "No Injury by Reason of LTFV Sales"). Moreover, the majority statement of reasons shows that the Commission investigated "whether an industry in the United States *is being* or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States" (44 FR 40734) (emphasis added).

Hence, it would appear obvious that had the majority concluded that there was present injury, it would not have considered whether there was likelihood of future injury.

10. In connection with its discussion of AGCL's expansion plans, the Commission majority noted that "[n]atural gas is the principal raw material used in the production of methyl alcohol and since AGCL has access to natural gas at a price much lower than that at which it is available in the U.S., AGCL is assured of a low cost supply of the primary raw material necessary for its expanded production" (44 FR 40735). With reference to this cost advantage enjoyed

Although the dissenting Commissioners recognized that the domestic industry was experiencing "some economic difficulty" (particularly in terms of profitability), they did not relate the domestic industry's (then) current economic problems to the LTFV imports from Canada. With regard to their determination that the domestic methyl alcohol producing industry was not likely to be injured by the LTFV imports, the dissenting Commissioners were "unable to ascertain any factors which would lead [them] to find that the likelihood of such injury is 'real and imminent'." (44 FR 40736). On this score, the dissenters sharply disagreed with the majority's apprehensions concerning expanding supplies of methyl alcohol from Canada, pointing out (44 FR 40738):

It is clear that in this case additional exports to the United States by AGCL are unlikely in the imminent future. First, AGCL is producing at virtually 100 percent of capacity and nearly all production is committed under contractual agreements to existing customers. Second, information supplied to the Commission indicates that AGCL's markets outside the United States are expanding and that selling prices in those markets are higher than corresponding U.S. prices. Finally, combined inventories of methyl alcohol held by AGCL and AGCI on March 31, 1979, are relatively small and would not significantly increase U.S. import penetration even if the entire inventory was suddenly diverted to this country.

AGCL has an expansion plan under consideration that could add two additional plants to existing facilities. However, even if AGCL decides to expand its production facilities, information presented to the Commission clearly indicates that the impact of any such expansion would not be felt in the U.S. market for at least three years. If construction on the new facilities began immediately, AGCL reports that production would not commence until 1982. Furthermore, AGCL's expansion plans are uncertain at present. Financing for the expansion has yet to be obtained. In addition, AGCL has indicated that it would have to evaluate future Canadian energy policies, the results of multilateral trade negotiations and potential new markets for methyl alcohol. We feel that, in view of all these factors, the length of time before any additional methyl alcohol could be exported to the United States is clearly not within the standard of "real and imminent."

The Congressional standard for determining likelihood of injury was articulated by the Senate Committee on Finance [11], which explained that future injury must be:

based upon evidence showing that the *likelihood is real and imminent* and not on mere supposition, speculation, or conjecture. [Emphasis added.]

In 1979, Congress again made its intent clear concerning determination of future injury. Congress, in repealing the Antidumping Act of 1921, replaced the language in the statute concerning the likelihood of injury with language directing the Commission to determine whether there exists a "threat of material injury". 19 U.S.C. § 1673 (1980). In that connection, Congress stressed a practical test: there must be "information showing that the threat is real and injury is imminent, not a mere supposition or conjecture". S.Rep.No. 249, 96th Cong., 1st Sess. 88, 89 (1979); H.R.Rep.No. 317, 96th Cong., 1st Sess. 47 (1979), U.S. Code Cong. & Admin.News 1979, p. 474.

We have seen that central to the majority's determination of likelihood of injury is AGCL's expansion plans. Nevertheless, the

---

by AGCL, the Commission's dissenters aptly observed that "this situation [cost advantage] is a comparative as opposed to an unfair trade advantage and therefore, is not an appropriate factor in terms of assessing whether or not a likelihood of injury exists in this case." (44 FR 40738). In its reply to plaintiff's cross-motion

(p. 11), defendant conceded that the majority's reference to the prices at which AGCL obtained natural gas is irrelevant to its injury determination.

11. S.Rep.No. 1298, 93rd Cong., 2d Sess. 180 (1974).

majority conceded that AGCL had not made a final decision on whether to proceed with the construction of the new plants, and speculated that "the outcome of this investigation *conceivably* may be a factor in the final decision" (44 FR 40735) (Emphasis added). The Commission majority further *speculated* that "[i]f AGCL has increased capacity and additional product availability and is able to continue to sell at LTFV to the U.S. market, the likelihood of increased penetration and injury to the domestic industry is apparent" (44 FR 40735).

Patently, the majority's analysis is flawed with supposition and conjecture. As stressed in the dissenting statement, AGCL's expansion plans were uncertain and depended upon several contingencies, and indeed, financing had not even been arranged. More to the point is the undisputed fact that even if AGCL had immediately decided to expand its production facilities, production in such facilities could not commence until 1982 at the earliest, assuming there were no unforeseen delays.

The dissenting Commissioners noted, among other significant factors making additional exports to the United States by AGCL unlikely in the imminent future, is that AGCL (the sole Canadian exporter) was operating at nearly 100 percent of its capacity, and virtually all of the methyl alcohol production was committed to its customers under existing contractual agreements. Consequently, AGCL had no immediate (or "present") ability to increase its production of methyl alcohol or to divert its available capacity to the United States. Hence, it is clear that any injury which might result at some undetermined future time could occur only if new facilities were completed; and under all the facts and circumstances the likelihood of future injury perceived by the Commission majority did not constitute "real and imminent" injury as intended by Congress.

Furthermore, the Commission majority found that "if" AGCL's planned facilities were constructed, that all of the new capacity, estimated to be about 700 million pounds of methyl alcohol, will be "available" for export to the United States. The majority then stated that such estimated additional future supply was the equivalent of more than 10 percent of *current* U.S. consumption, and that "[t]he U.S. market is a logical market for any increased Canadian production" (44 FR 40735). Thus, the Commission majority not only assumed the future increased capacity available for export to the United States, but also implicitly postulated, contrary to the evidence in the record, that there would be no future expansion in the United States consumption of methyl alcohol. The dissenting statement points out that "[o]ver the next several years the market for methyl alcohol is forecasted to expand as methyl alcohol is used in a widening range of applications. Of particular significance are the potential uses of methyl alcohol as fuel for the generation of electricity in power plants and as a gasoline extender and base for synthetic gasoline" (44 FR 40736).

In summary, the record before the Commission shows simply a mere *possibility* that injury might occur at some remote future time. Such showing, viewed in the context of the "real and imminent" standard enunciated by Congress, compels the conclusion that the record lacks substantial evidence of likelihood of injury to the United States methyl alcohol producing industry. It follows that Treasury's Finding of Dumping of methyl alcohol from Canada— an essential predicate for Customs' demand that plaintiff file an antidumping bond— was erroneous.[12] Accordingly, it is hereby

12. Defendant, in a letter dated May 14, 1981, called to the Court's attention a recent decision of the United States Court of Appeals for the Second Circuit (Feinberg, C. J.) dated May 12, 1981, *Alberta Gas Chemicals, Ltd. v. Celanese Corporation and Celanese Chemical Company, Inc.,* 650 F.2d 9 (2d Cir. 1981). In that action, Alberta (the Canadian exporter)

charges the defendants with fraud and unfair competition, by presenting false testimony before the Commission concerning their plans to expand methanol production capacity and their estimate of demand in the United States for methanol. The complaint prayed for an injunction requiring Celanese to disclose the true facts to the Commission, and also sought dam-

**792**

ORDERED, ADJUDGED AND DECREED THAT:

1. Defendant's motion for summary judgment is denied;

2. Plaintiff's cross-motion for summary judgment is granted; and

3. The Regional Commissioner of Customs at the port of New York shall accept Entry No. 79–638078–8 of August 15, 1979, and deliver the merchandise in issue to plaintiff, without requiring the posting of an Antidumping Bond or the production of information pursuant to section 208 of the Antidumping Act of 1921, as amended (19 U.S.C. § 167).

ages. Judge Sofaer of the United States District Court for the Southern District of New York, in a memorandum opinion and order dated October 8, 1980, dismissed the action on the grounds that the complaint failed to state a cause of action, and that even if the complaint stated a cause of action, the matter fell within the jurisdiction of the United States Court of International Trade. The District Court also noted that under the doctrine of primary jurisdiction the issues relating to Celanese's conduct during the hearing before the Commission should be resolved, in the first instance, by the Commission. The Circuit Court reversed, noting that Alberta did not call the alleged perjury to the attention of the Commission and that the instant action was still pending. The Court of Appeals ruled that the Commission has the power to protect the integrity of its own proceedings and should have an opportunity to resolve the perjury issue. Consequently, the case was remanded to the District Court with instructions to stay all proceedings before it pending further proceedings before the Commission.

In response to defendant's letter of May 14, 1981, plaintiff submitted a letter to the Court, dated May 18, 1981, agreeing with defendant's observation that neither the United States nor the International Trade Commission is a party in the *Celanese* matter, and suggesting that the *Celanese* decision should not affect the timing or content of this Court's decision. I agree with the comments of counsel for both parties concerning the *Celanese* case.