PHILIPP BROTHERS, INC., Osaka Titanium Company, Ltd., and Toho Titanium Company, Ltd., Plaintiffs,

v.

UNITED STATES, Defendant,

and

RMI Co. and Titanium Metals Corp. of America, Intervenor-Defendants.

No. 85–1–00039.

United States Court of International Trade.

July 17, 1986.

---

(Denis H. Oyakawa, Patrick Fields, Los Angeles, Cal., Yoshihiro Saito) and Wender, Murase & White (Matthew J. Marks, Greyson Bryan, Roger Selfe), New York City, for plaintiffs.

Lyn M. Schlitt, General Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S.I.T.C. (Stephen A. McLaughlin) Washington, D.C., for defendant.

Wilmer, Cutler & Pickering (A. Douglas Melamed, John D. Greenwald, Richard K. Lahne), Washington, D.C.; John F. Hornbostel, Jr., New York City, RMI Company, for intervenor-defendant RMI Co.

Pillsbury, Madison & Sutro (Donald E. de Kieffer, Francis J. Sailor), Washington, D.C., for intervenor-defendant Titanium Metals Corp.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiffs challenge a determination of the United States International Trade Commission (Commission) that an industry in the United States is threatened with material injury by reason of imports of titanium sponge from Japan. *Titanium Sponge from Japan and the United Kingdom,* Inv. No. 731–TA–161 (Final), U.S.I.T.C. Pub. No. 1600 *(Report )*. The Court holds that the Commission's determination is supported by substantial evidence and in accordance with law.

### I. Background

In November, 1983 intervenor RMI Company petitioned the International Trade Administration, Department of Commerce (Commerce) on behalf of the domestic titanium sponge industry alleging that imports of titanium sponge from Japan were, or were likely to be, sold in the United States at less than fair value, that these imports were materially injuring, or threatening to injure, an industry in the United States, and that an antidumping duty should be imposed under 19 U.S.C. § 1673 (1982).

Commerce initiated an investigation and found weighted-average dumping margins of 15.09% for plaintiff Osaka Titanium Co. and 34.25% for plaintiff Toho Titanium Co. Notice of its final affirmative determination was published on October 1, 1984. 49 Fed.Reg. 38,687 (1984).

On October 29, 1984, the Commission determined unanimously that an industry in the United States was not materially injured by reason of imports of titanium sponge from Japan and determined by a vote of 3–2 that an industry in the United States was threatened with material injury by reason of imports of titanium sponge from Japan. An antidumping duty order was published in the Federal Register on November 30, 1984. 49 Fed.Reg. 47,053 (1984).

### II. Judicial Review

The Commission's determination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). Plaintiffs emphasize that the Commission did not find material injury by reason of imports and determined a threat of material injury by a

vote of three to two. "This, therefore, is as weak a final affirmative determination as the Commission can produce—a three to two division of Commissioners and a foggy forecast of the future as the basis of the three-person majority's determination." Plaintiffs' Brief at 2. The size of the Commission majority is, however, irrelevant. The Court may consider only whether the determination of the Commission is unsupported by substantial evidence or otherwise not in accordance with law.

This Court recently considered the scope of "substantial evidence" review.

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126] (1938), quoted in *Matsushita Electric Industrial Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir.1984). It is "enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury," *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660] (1939), and "something less than the weight of the evidence ... [T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620 [86 S.Ct. 1018, 1026, 16 L.Ed.2d 131] (1966). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 [71 S.Ct. 456, 459, 95 L.Ed. 456] (1951); *Matsushita Electric Industrial Co. Ltd. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984) (substantial evidence a "limited standard of review").

*Carlisle Tire & Rubber Co. v. United States*, 9 CIT —, 622 F.Supp. 1071, 1074 (1985).

The standard of judicial review of the Commission's interpretation of the statutes it administers was recently summarized by our appellate court:

A reviewing court must accord substantial weight to an agency's interpretation of a statute it administers. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–51 [98 S.Ct. 2441, 2445, 57 L.Ed.2d 337] (1978); *Udall v. Tallman*, 380 U.S. 1, 16 [85 S.Ct. 792, 13 L.Ed.2d 616] (1964). Though a court may reject an agency interpretation that contravenes clearly discernible legislative intent, its role when that intent is not contravened is to determine whether the agency's interpretation is "sufficiently reasonable". *Federal Election Committee v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39 [102 S.Ct. 38, 46, 70 L.Ed.2d 23] (1981); *see Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984). The agency's interpretation need not be the only reasonable construction or the one the court would adopt had the question initially arisen in a judicial proceeding. *Chevron, U.S.A. Inc. v. National Resources Defense Council*, 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11 [81 L.Ed.2d 694] (1984); *see Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed.Cir.1985).

*American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986).

### III. Discussion

The Commission made its determination pursuant to 19 U.S.C. § 1673d(b)(1)(A)(ii) (1982), which provides that the Commission "shall make a final determination of whether an industry in the United States is threatened with material injury ... by reason of imports." The parties agree that the Commission may make an affirmative finding only when it finds both (1) threat of material injury and (2) that the threat of material injury is caused by imports. *See American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) *aff'd sub. nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985).

"Material injury" is defined by statute as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982). Congress has directed the Commission to consider "all relevant economic factors which have a bearing on the state of the industry," 19 U.S.C. § 1677(7)(C)(iii), including, but not limited to:

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

*Id; see* H.R.Rep. 317, 96th Cong., 1st Sess. 46 (1979); S.Rep. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 474.

■ The Commission has latitude in weighing economic factors it considers relevant to its determination of threat of material injury, but the determination "must be based upon information showing that the threat is real and injury is imminent, not a mere supposition or conjecture." S.Rep. No. 249, 96th Cong. 1st Sess. 88–89 (1979), U.S.Code Cong. & Admin.News 1979, pp. 474, 475; H.R.Rep. No. 317, 96th Cong., 1st Sess. 47048 (1979). *Cf.* Trade and Tariff Act of 1984, Pub.L. 98–573, § 626, codified at 19 U.S.C. § 1677(7)(F)(ii) (Supp. II 1984), (applicable to petitions filed after October 20, 1984; the petition in this case was filed November 28, 1983).

A. Threat of Material Injury

Plaintiffs first argue that there is not substantial evidence in the record to support the Commission's finding that the threat to the domestic titanium sponge industry was real and imminent.

The record indicates that titanium sponge is an intermediate product; it is used to make titanium ingot, which is used to make a variety of titanium mill products, between 60 and 80% of which are used, in the United States, in the aerospace industry. During the period of the Commission investigation, January 1981 to June 1984, there were four domestic companies producing titanium sponge. Three of the four, including intervenors RMI and Titanium Metals, Inc. were integrated producers— they also produced titanium ingot and mill products. There were also four ingot producers that did not produce titanium sponge. The three integrated sponge producers account for all but 5 to 10.5% of the domestic consumption of sponge. The nonintegrated ingot producers buy their sponge from the lone nonintegrated sponge producer, International Titanium, Inc. (ITI), or from importers.

The Commission majority noted that the titanium sponge industry is a highly volatile industry that has yet to fully mature. It has been plagued by a recurring pattern of sharp supply and demand shifts and has had to rely on demand projections (for both military and commercial markets) which have tended to be unreliable because of changes in a complex mosaic of factors, including the speculative nature of aerospace and defense demand.

*Report* at 8.

The last boom period in the industry was 1979–81, during a rapid increase in demand for commercial aircraft; there was a significant slump in 1982–83; and the domestic industry improved in January-June 1984. Plaintiffs do not dispute the Commission's findings that apparent domestic consumption of titanium sponge fell from 68 million pounds in 1981 to 31.4 million pounds in 1983, before rising to 30.9 million pounds in January-June 1984; domestic production fell from 55.7 million pounds in 1981 to 28.4 million pounds in 1983, before increasing to 22.4 million pounds in January-June 1984; domestic capacity utilization went from 92.4 percent in 1981 to 45.1 percent in 1983 to 71.7 percent in January-June 1984. Employment and wages in the titanium sponge industry also declined from 1981 before rising in 1984. Capital expenditures declined dramatically in January-June 1984.

The Commission said that there was real and imminent threat of material injury despite the 1984 recovery because (1) prices and unit values remained in decline for sponge delivered in the first half of 1984, (2) future domestic sales to the National Defense Stockpile (stockpile) were threatened, and (3) the lone domestic nonintegrated sponge producer, ITI, was discouraged from making capital investment. The Commission found that future increases in imports would cause material injury in lost sales and further depression of prices.

Plaintiffs do not dispute, and the record evidence supports, the Commission's finding that prices and unit values continued to decline for sponge delivered in the first half of 1984. The price in 1984 was less than half the 1981 price. Plaintiffs do dispute that the record supports the Commission's finding that future stockpile purchases were imminent. In September, 1983 plaintiff Philipp Brothers, Inc. (Phibro) won a General Services Administration (GSA) contract to supply 6 million pounds of sponge, out of 9 million pounds bought, for the stockpile. With this contract, plaintiffs' share of the United States market went from 6.2 percent in 1983 to 24.4 percent in the first half of 1984. Plaintiffs note that the 1983 stockpile purchase was the first in 20 years and argue that the record does not contain substantial evidence to support the Commission's finding that future stockpile purchases were imminent.

The record indicates that (1) the Federal Emergency Management Agency (FEMA), which manages the stockpile, stated in May, 1980, that the agency's goal was to procure 195,000 tons (390 million pounds) (2) GSA had 32,331 tons (64,662 million pounds) of sponge in the stockpile as of August 2, 1983, and (3) both FEMA and GSA have emphasized the high priority of titanium sponge in the overall stockpile requirements. At the urging of plaintiffs, the Commission sought to verify the likelihood of additional procurement of sponge for the stockpile. The record contains a letter from FEMA stating that it anticipated that significant purchases of sponge

for the stockpile would be made in fiscal years 1985 and 1986. This is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Federal Trade Commission v. Indiana Federation of Dentists*, 54 U.S. L.W. 4531, 4533, —— U.S. ——, ——, 106 S.Ct. 2009, 2014, 90 L.Ed.2d 445 (1986) quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). The Court holds that the Commission's finding that titanium sponge purchases by the GSA were imminent is supported by substantial evidence on the record.

Plaintiffs also contest the Commission's finding of a real threat of material injury to ITI, the only domestic nonintegrated producer of titanium sponge. ITI was established to supply sponge to nonintegrated mill product manufacturers and therefore most directly competes with imports. Plaintiffs first argue that ITI is only "technically nonintegrated," because its "parent," Wyman-Gordon Company, is a "reliable customer" for its sponge. Plaintiffs' Brief at 52. The record supports the Commission's findings that Wyman-Gordon is in the position of an independent purchaser, negotiating its contracts with ITI on an arms-length basis. Moreover, Wyman-Gordan does not purchase all of ITI's production. ITI's sales to other melters have been a substantial proportion of its production.

Plaintiffs also argue that ITI's difficulties were caused by high start-up costs and insufficient certification to provide titanium sponge for all military and aerospace end uses. However, record evidence indicates that ITI lost sales and revenues to imports and that its inability to maintain a positive cash flow from operations impaired its ability to raise capital necessary for expansion in highly capital intensive sponge production facilities. Granting the agency's interpretation of both the evidence and the statute "substantial weight," *see American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986), the Court holds that the Commission's finding of a real threat of

material injury to ITI is supported by substantial evidence or otherwise in accordance with law.

Plaintiffs argue that the domestic titanium sponge industry was recovering at the end of the investigation period, in June 1984 and that the record does not support the Commission's finding that there was a real and imminent threat to the domestic sponge industry. Plaintiffs point to evidence in the record that in June 1984 the domestic industry was operating at over 80% capacity, with RMI "reportedly operating at full capacity," *Report* at 21–22 (Views of Commissioner Stern), prices were moving up for contracts entered into in the first half of 1984, and employment and wages were improving.

■ Plaintiffs' interpretation of the record evidence is plausible, but "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The Court holds that the Commission's determination that there was real and imminent threat of material injury because prices remained in decline for sponge delivered in the first half of 1984, future domestic sales to the stockpile were threatened, and ITI was discouraged from making capital investment is supported by substantial evidence in the record as a whole or otherwise in accordance with law.

## B. Causation

Plaintiffs also argue that the Commission's determination that the threat to the domestic titanium sponge industry is caused by Japanese imports is not supported by substantial evidence or otherwise in accordance with law.

The Commission found that the Japanese intended to increase imports because (1) they have substantially increased capacity while production and plant utilization have fallen, (2) their unused capacity and volume-related efficiencies give them incentive to increase imports to the United States, the world's largest titanium sponge market, and (3) they have sought to increase their penetration in the United States market by aggressive pricing practices.

Plaintiffs do not dispute the Commission findings that Japanese capacity increased from 62 million pounds in 1981 to 40.6 million pounds in January-June 1984 while production fell from 55 million pounds in 1981 to 23.3 million pounds in 1983, before rising slightly to 14.7 million pounds in January-June 1984. Unlike the domestic industry, however, Japanese producers increased capacity over that period so that capacity utilization fell from 88.7% in 1981 to 29.3% in 1983, but rose only to 36.2% in January-June 1984.

Plaintiffs say that capacity alone is insufficient to prove intent to increase imports, citing *American Spring Wire Corp. v. United States*, 8 CIT 20, 28, 590 F.Supp. 1273, 1280 (1984) *aff'd sub. nom., Armco, Inc. v. United States*, 760 F.2d 249 (Fed. Cir.1985). Plaintiffs say the increase in Japanese capacity was in response to increased world demand, noting that the record indicates that Japanese imports to the European Communities increased by more than 50% in 1984.

■ Although "[t]he mere fact of increased capacity does not *ipso facto* imply increased exports to the United States," *American Spring Wire*, 8 CIT at 28, 590 F.Supp. at 1280, capacity may be considered by the Commission. *See Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 592 F.Supp. 1318 (1984); *Alberta Gas Chemicals, Inc. v. United States*, 1 CIT 312, 515 F.Supp. 780 (1981). In *Rhone Poulenc* the Court affirmed a Commission finding of threat of material injury where, as in this case, the Commission looked at excess foreign capacity and pricing practices.

The record contains several instances of lost revenue to domestic producers caused by lower price quotes from Japanese importers. In response to these lower price quotes domestic producers lowered their

prices to meet competition from imports and obtain or keep contracts. The most significant of these events involved a large, long-term contract RMI won with Martin-Marietta Aluminum, Inc. in May 1983. In October 1983 Phibro made three unsolicited offers to Martin-Marietta at prices substantially lower than the contract price. The contract contained a "meet competition" clause, so RMI was faced with the choice of either meeting Phibro's price or relinquishing the contract.

█ Although Phibro withdrew its offers immediately after RMI filed its antidumping petition in November, 1983, Martin-Marietta subsequently told RMI of its "desire to pursue discussions for [RMI] to remain competitive," and these discussions resulted in a reduction of RMI's prices for January-June 1984. The Commission majority recognized this loss of revenue and viewed Phibro's behavior as evidence of aggressive pricing to increase market share. *Report* at 12. Plaintiffs argue that the episode does not evidence aggressive behavior because the offer was withdrawn. The offer was withdrawn, however, only after RMI filed its antidumping petition. The Commission may disregard or give little weight to tactical maneuvering after the filing of an antidumping petition. *See, e.g., Rhone Poulenc*, 8 CIT at 53, 592 F.Supp. at 1324–25. Plaintiffs also attempt to minimize the incident by asserting that RMI lost relatively little revenue, dismissing RMI's price reduction as insignificant. However, the Commission did not focus so much on the amount of the lost revenues as on the evidence of aggressive Japanese producer pricing presented by this incident.

█ Plaintiffs further argue that injury to domestic industry is merely speculative, as in *Alberta Gas Chemicals, Inc. v. United States*, 1 CIT 312, 515 F.Supp. 780 (1981), where the Court reversed an affirmative Commission finding of threat of material injury. Plaintiffs argue that further Japanese penetration in the domestic market and future stockpile purchases are similarly speculative. In *Alberta Gas* the foreign producer was producing at 100% ca-

pacity and nearly all production was committed under existing contracts. The Court held that plans by the foreign industry to increase capacity were indefinite. 1 CIT at 323–24, 515 F.Supp. at 790–91. In this case, excess capacity exists and, as the Court has held, the Commission's finding of future stockpile purchases is supported by substantial evidence.

Plaintiffs and the two dissenting members of the Commission attribute depressed sponge prices to low demand for mill products, not pressure from dumped Japanese sponge. When demand for mill products is low, the integrated producers have excess sponge, which they must sell on the commercial market. Plaintiffs argue that the record indicates that the Japanese sponge industry also experienced difficulties in 1981–83, during which time production, exports to the United States, and prices all fell. Plaintiffs say they merely respond to low domestic prices caused by the integrated domestic producers.

This view is plausible, and the Court might find it compelling if it were to consider the evidenciary record *de novo*. But the Court's review is at an end if the agency's interpretation is reasonable. *American Lamb, supra*. The Court holds that the Commission could reasonably find that Japanese imports caused threat of material injury by their increased capacity, incentive to increase imports to the United States, and aggressive pricing tactics.

### IV. Conclusion

The Court holds that the Commission's determination is supported by substantial evidence and otherwise in accordance with law. Plaintiffs' motion for judgment on the agency record is denied. The action is dismissed. Judgment will be entered accordingly.

So ordered.