**ST. REGIS MOHAWK TRIBE, NEW YORK, Petitioner,**

v.

**William E. BROCK, Secretary of Labor, Respondent.**

**No. 1258, Docket 85–4042.**

United States Court of Appeals, Second Circuit.

Argued May 22, 1985.

Decided July 17, 1985.

---

Richard J. Dauphinais, Native American Rights Fund, Boulder, Colo. (Jeanne S. Whiteing, Native American Rights Fund, Boulder, Colo.), for petitioner.

Jeffrey A. Hennemuth, Atty., U.S. Dept. of Labor, Office of the Solicitor, Washington, D.C. (William E. Brock, Secretary of Labor, Francis X. Lilly, Sol. of Labor, Seth D. Zinman, Associate Sol. for Legislation and Legal Counsel, William H. DuRoss, III, Associate Sol. for Employment and Training, Harry L. Sheinfeld, Counsel for Litigation, U.S. Dept. of Labor, Office of the Solicitor, Washington, D.C. and Jonathan Kay, Office of the Regional Solicitor, U.S. Dept. of Labor, New York City), for respondent.

Before LUMBARD, FRIENDLY and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

This is a petition by the St. Regis Mohawk Tribe of Indians (the Tribe) pursuant to 29 U.S.C. § 817(a)[1] to review a decision of the Secretary of Labor (the Secretary) which denied the Tribe's request for review of a decision and order of an Administrative Law Judge (ALJ). The ALJ's decision disallowed expenditures of $39,045.03 made by the Tribe in connection with two grants under the Comprehensive Employment and Training Act (CETA), 29 U.S.C. §§ 801–999 (as amended), and directed repayment of the disallowed expenditures out of non-CETA funds.

The Tribe is a small tribe of Indians located in northeastern New York near the Canadian border. Beginning in 1975, it sought funds under CETA in order to become a prime sponsor of employment and training programs for tribal members, 97% of whom were at or below the poverty level. We are here concerned with Grant No. 99–6–522–30–127 (Grant No. 127), covering the period from September 15, 1975 to January 31, 1977, and Grant No. 99–6–522–30–54 (Grant No. 54), covering the pe-

riod from October 1, 1976 to December 31, 1978. After modifications, a total of $273,503 was awarded under Grant No. 127, and a total of $1,012,830 was awarded under Grant No. 54.

The grants were audited in early 1978, and an exit conference upon completion of the audit was held on May 5, 1978. For Grant No. 127, expenditures of $5,351 were recommended for disallowance and expenditures of $16,255 were questioned, a total of $21,606. For Grant No. 54, which the audit reviewed only through September 30, 1977 (although with extensions the grant ran until the end of 1978), expenditures of $36,881 were recommended for disallowance and expenditures of $92,179 were questioned, a total of $129,060.

On November 18, 1980, the Director of the Grant and Audit Closeout Task Force in the Employment and Training Administration (the Grant Officer) issued an initial determination disallowing the entire $21,606 in expenditures made under Grant No. 127 that had been questioned or recommended for disallowance by the auditors. This initial determination was silent with respect to Grant No. 54. In January and June, 1981, the Tribe submitted additional information to the Department of Labor (the Department). On July 23, 1981, the Grant Officer issued a revised initial determination disallowing the same $21,606 under Grant No. 127 and adding to this the $129,060 in expenditures questioned or recommended for disallowance by the auditors in connection with Grant No. 54. On September 28, 1981, nearly three-and-a-half years after the initial audit, the Grant Officer issued a final determination, disallowing only $68,334 in expenditures made under the two grants.

The Tribe filed a request for a hearing before an ALJ on October 13, 1981. The hearing was held on December 17, 1982, and additional briefing was completed in June, 1983. The ALJ did not issue a deci-

---

1. The Comprehensive Employment and Training Act was repealed in 1982 and is not contained in the 1982 edition of the United States Code; all citations in this opinion are to the Fifth Supplement to the 1976 edition printed in 1981.

sion and order until January 4, 1985. He reduced the Grant Officer's disallowance to $39,045.03, and held that the Tribe was required to repay that sum to the Department out of non-CETA funds.

By letter dated January 30, 1985, the Tribe requested that the Secretary dismiss the case and set aside the ALJ's order on the grounds that the final determination of the Grant Officer had been untimely under § 106(b) of CETA and the regulations promulgated thereunder, 20 C.F.R. §§ 676.-86, .88. The Secretary declined to accept the case for review, and, pursuant to 20 C.F.R. § 676.91(f), the ALJ's decision and order became the final order of the Secretary. The Tribe was formally notified of the denial of review by the Secretary in a letter dated March 1, 1985, and this petition to review followed. We deny the petition.

## DISCUSSION

The Tribe does not dispute the merits of the finding that it misused CETA funds in the amount of $39,045.03. Rather, it asserts that the Secretary cannot recover these because of two principal legal barriers which we will now discuss.

### I. *The 120-Day Period for a Final Determination*

The Tribe argues that "collection is outside of the Secretary's jurisdiction because he failed to issue his Final Determination within 120 days of receipt of the audit" as required by § 106(b) of CETA, 29 U.S.C. § 816(b), and the Secretary's regulations thereunder, 20 C.F.R. § 676.88. The statute, as substantially revised in the CETA Amendments of 1978, Pub.L. No. 95–524, 92 Stat. 1909, 1926, provides (emphasis added):

> Whenever the Secretary receives a complaint from any interested person or organization ... which alleges, or whenever the Secretary has reason to believe (because of an audit, report, on-site review, or otherwise) that a recipient of financial assistance under this Act is failing to comply with the requirements of this Act, the regulations under this Act

or the terms of the comprehensive employment and training plan, the Secretary shall investigate the matter. *The Secretary shall conduct such investigation, and make the final determination required by the following sentence regarding the truth of the allegation or belief involved, not later than 120 days after receiving the complaint.* If, after such investigation, the Secretary determines that there is substantial evidence to support such allegation or belief that such a recipient is failing to comply with such requirements, the Secretary shall, after due notice and opportunity for a hearing to such recipient, determine whether such allegation or belief is true.

The Secretary's regulations amplify the emphasized sentence as follows:

> *Final determination.* If all the parties and the Grant Officer cannot informally resolve any matter pursuant to paragraph (d), the Grant Officer shall, not later than 120 days after the filing of the complaint (or receipt of a final audit or investigation report in the absence of a complaint), provide each party with a final written notice in duplicate by certified mail, return receipt requested, that (1) indicates that efforts to informally resolve matters contained in the initial determination pursuant to paragraph (a) have been unsuccessful, (2) lists those matters upon which the parties continue to disagree, (3) lists any sanctions, and required corrective actions, including any other alteration or modification of the plan, grant, agreement or program intended by the Grant Officer, and (4) informs the parties of their opportunity to request a hearing pursuant to these regulations. The Grant Officer shall also mail a copy of his final determinations to any parties in interest.

20 C.F.R. § 676.88(e). The Secretary does not dispute that the audit report was received by the Department more than 120 days before the date of the Grant Officer's final determination of July 23, 1981, but maintains that this does not bar the

Government from recovering misspent funds.

The proposition advanced by the Tribe, that Congress meant to bar the Government from recovering funds provided by United States taxpayers and misspent by a grantee unless the Secretary succeeds in making a final determination within the short period of 120 days from the time he first receives information raising the possibility of misuse, is not, to say the least, of the sort that commands instant assent.[2] Despite its acceptance by two courts of appeals, *see Lehigh Valley Manpower Program v. Donovan,* 718 F.2d 99 (3 Cir.1983); *City of Edmonds v. United States Dep't of Labor,* 749 F.2d 1419 (9 Cir.1984); *Pierce County v. United States Dep't of Labor,* 759 F.2d 1398 (9 Cir.1985), we must subject it to most careful scrutiny.[3]

Although § 106(b) states that the Secretary "shall" issue his final determination within 120 days, it does not specify the consequence of his failure to do so. The Tribe argues that anything less than a complete bar on further administrative action is inconsistent with Congress' use of the verb "shall"; any other interpretation, the Tribe argues further, would render the 120-day deadline unenforceable and hence meaningless. The Secretary responds that interpreting the 120-day deadline as a limitation on the Secretary's authority is inconsistent with the "broad remedial intent of the CETA Amendments of 1978," which added § 106(b). According to the Secretary, enforcement of the 120-day provision is limited to the right of an interested party to compel the Grant Officer to complete his investigation forthwith or to force the Department to proceed immediately with an administrative hearing.

■ The Tribe puts on the word "shall" a weight it cannot bear in the present context. In numerous cases construing similar statutes directing that administrative action "shall" be completed within a specified time, courts have enunciated a general rule that

[a] statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.

*Fort Worth Nat'l Corp. v. Federal Savings & Loan Ins. Corp.,* 469 F.2d 47, 58 (5 Cir.1972) (construing 12 U.S.C. § 1730a(e)) (emphasis added); *see also Maryland Casualty Co. v. Cardillo,* 99 F.2d 432, 434 (D.C.Cir.1938) (construing 33 U.S.C. § 919); *Usery v. Whitin Mach. Works, Inc.,* 554 F.2d 498, 501 (1 Cir.1977) (construing 19 U.S.C. § 2273(a)); *Marshall v. Local Union No. 1374,* 558 F.2d 1354, 1357 (9 Cir. 1977) (construing 29 U.S.C. § 482(b)); *Thomas v. Barry,* 729 F.2d 1469, 1470 n. 5 (D.C.Cir.1984) (construing Home Rule Act, Pub.L. No. 93–198, 87 Stat. 774 (1973)) (dictum); *Diamond Match Co. v. United States,* 181 F.Supp. 952, 958–59 (Cust.Ct. 1960) (construing 19 U.S.C. § 1516(c)); *Alberta Gas Chems., Inc. v. United States,* 1 C.I.T. 312, 515 F.Supp. 780, 784–86 (1981) (construing 19 U.S.C. § 160(c)(1)); *United States v. Log Mountain Mining Co.,* 550 F.Supp. 811, 815 (E.D.Tenn.1982) (construing 30 U.S.C. § 1268(c)).[4] Such decisions

2. The regulations encourage informal resolution of disputes, *see* 20 C.F.R. § 676.88(d), and the regulation previously quoted, which implements the 120-day deadline, requires that the Grant Officer's final determination include a statement that such efforts have been unsuccessful, *id.* § 676.88(e)(1).

3. In a letter submitted to the Court after the argument, the Government estimated that $109,-225,621 in audited and disallowed costs might be lost to the Government if the view of the Third and Ninth Circuits were adopted nationwide.

4. The principle enunciated in these cases goes back at least as far as *French v. Edwards,* 80 U.S. (13 Wall.) 506, 511 20 L.Ed. 702 (1871), where, construing a statute authorizing sale of only as much of a taxpayer's property as was necessary to enforce a tax lien, the Court stated:

There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which

are particularized applications of "the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided...." *United States v. Nashville, C. & St. L. Ry.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886); *see also United States v. Thompson*, 98 U.S. 486, 489, 8 Otto 486, 489, 25 L.Ed. 194 (1878) ("It was deemed important that, while the sovereign was engrossed by the cares and duties of his office, the public should not suffer by the negligence of his servants"); *Stanley v. Schwalby*, 147 U.S. 508, 515, 13 S.Ct. 418, 421, 37 L.Ed. 259 (1893) (quoting *United States v. Hoar*, F.Cas. No. 15,373 at 330 (Story, J.) ("The true reason, indeed, why the law has determined that ... no delay should bar [the sovereign's] right ... is to be found in the great public policy of preserving the public rights, revenues and property from injury and loss, by the negligence of public officers")); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938).

The legislature will not be deemed to have departed from this policy unless it clearly says so. Section 106(b) does not state that failure to issue a final determination within 120 days of the complaint bars further action by the Secretary challenging the sponsor's use of CETA funds, and thus, under the rule recognized in the cases cited above, should not be interpreted to impose this consequence in the absence of persuasive extrinsic evidence that Congress so intended. *Cf. Usery v. Whitin Mach. Works, Inc., supra,* 554 F.2d at 500–03; *National Cable Television Ass'n v. Copyright Royalty Tribunal*, 724 F.2d 176, 189 n. 23 (D.C.Cir.1983) (construing 17 U.S.C. § 804(e)); *Alberta Gas Chems., Inc., supra,* 515 F.Supp. at 784–86. *See also United States v. Morris*, 252 F.2d 643, 649 (5 Cir.1958) (construing statutorily authorized Migrant Labor Agreement); *Ralpho v. Bell*, 569 F.2d 607, 626–28 (D.C.Cir.1977)

(construing 50 U.S.C.App. § 2019b(e)). Inquiry into the legislative history of CETA discloses no such evidence; to the contrary, it significantly strengthens the conclusion that failure to meet the 120-day provision in § 106(b) was not intended to bar later action by the Secretary to recover misused Government funds.

Concern with the adequacy of the Department's oversight of misuse of CETA funds by prime sponsors was prevalent during the consideration of the CETA Amendments of 1978, and the general theme of improving enforcement mechanisms was an important one in the committee hearings. *See, e.g., Comprehensive Employment and Training Act Amendments of 1978: Hearings on S. 2570 Before the Subcomm. on Employment, Poverty and Migratory Labor of the Senate Comm. on Human Resources*, 95th Cong., 2d Sess. 591 (letter from Ray Marshall, Secretary of Labor, to Sen. Nelson), 749 (testimony of Tiny Wells, AFSCME), 1329 (statement of William Welsh, AFSCME), 1526 (statement of Ann Schmitt, Director, Women's Lobby) (1978) [hereinafter cited as Senate Hearings]; *Department of Labor Monitoring of Manpower Programs for the Hard to Employ: Hearings Before the Subcomm. on Manpower and Housing of the House Comm. on Government Operations*, 95th Cong., 2d Sess. 83–85 (testimony of Thomas Komarek, Acting Regional Administrator, Department of Labor), 451 (statement of Rep. Collins, Committee Chairwoman), 564–65 (testimony of Art Lewis, Executive Director, Wayne County prime sponsor), 744–45 (statement of Rep. Maguire), 746–79 (testimony of Ernest Green, Assistant Secretary, Department of Labor) (1978) [hereinafter cited as House Hearings]. Discussion of preventing abuse by prime sponsors was equally prevalent in the floor debates on the bill. *See, e.g.,* 124 Cong.Rec. 25,168 (statement of Rep. Hawkins), 25,221–22 (statement of Rep. Cornell), 25,238 (statement of Rep. Anderson),

---

the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless

accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated.

25,243 (statement of Rep. Maguire), 27,244 (statement of Sen. Domenici), 27,803 (statement of Sen. Schweiker), 27,825 (statement of Sen. McClure). Consequently, significant additions to CETA were made both by the congressional committees and on the floor of the Congress, and, as finally enacted, the 1978 Act included numerous new anti-abuse provisions. *E.g.*, § 3(a), 18 U.S.C. § 665(a) (criminal sanctions); § 106, 29 U.S.C. § 816 (administrative complaints and sanctions); § 123(g), 29 U.S.C. § 825(g) (administrative authority to establish regulations to prevent abuses such as nepotism, kickbacks, inadequate recordkeeping, commingling of funds); § 134, 29 U.S.C. § 836 (bonding requirement for fund recipients). According to the Senate Report:

> The committee believes that all of these provisions, taken together, will work to insure that program abuses are deterred, exposed, and corrected. The committee considers it a serious matter for persons to spend these funds, or to allow these funds to be spent in ways not authorized by Congress, thus impairing the Nation's effort to effectively help those intended to be assisted under this act. The committee expects the Secretary and the Attorney General to take prompt and decisive steps to remedy abuses whenever and at whatever level and place they occur.

S.Rep. No. 891, 95th Cong., 2d Sess. 43 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4480, 4523. The overriding goal was to insure that "the Secretary should have maximum authority to protect the integrity of the program." S.Rep. No. 891, *supra*, at 21, 1978 U.S.Code Cong. & Ad.News at 4501; *see also id.* at 42–43, 1978 U.S.Code Cong. & Ad.News at 4522–23; H.R.Rep. No. 1124, 95th Cong., 2d Sess. 3, 13 (1978).

One problem disclosed in the committee hearings was the difficulty experienced by participants, subgrantees, contractors and other interested persons in having complaints about prime sponsors' failure to meet CETA grant conditions resolved within a reasonable time. *See, e.g.*, Senate Hearings, *supra*, at 1329 (statement of Wil-

liams Welsh), 1526 (statement of Ann Schmitt); House Hearings, *supra*, at 753–65 (testimony of Rocco DeMarco, Director, Office of Special Investigations, Department of Labor, and Lawrence Rogers, Director, Office of Field Operations, Department of Labor). Although the 1973 CETA contemplated investigation by the Secretary of "formal allegations" made by interested parties, § 108(b)(2), 87 Stat. 847, it did not spell out procedures for a complaint process, and the procedures established in the regulations provided no time limits for filing or processing complaints, *see* 29 C.F.R. §§ 98.42–.48 (1977). The result, as summarized by the Senate Committee, was that "[i]n some cases grievances have been either ignored, or there has been interminable delay in their resolution." S.Rep. No. 891, *supra*, at 42, 1978 U.S.Code Cong. & Ad.News at 4522. To cure this, the Senate added § 106(a) to the bill. Subparagraph (1) required each prime sponsor to "establish and maintain a grievance procedure, ... for handling complaints about the program arising from its participants, subgrantees and contractors, or from other interested persons." The Secretary was directed to promulgate regulations "to ensure that a [prime sponsor] shall make a determination as to the merits of a complaint within 60 days after receipt of such complaint." Subparagraph (2) authorized an appeal to the Secretary and imposed a time limit on his resolution of the complaint as well:

> Whenever the Secretary receives a complaint from any interested person who, or organization which, has exhausted the recipient's grievance system established pursuant to paragraph (1), or other information including findings of other agencies or courts, that a recipient of financial assistance under the Act is failing to comply with the requirements of the Act, the regulations under the Act, or the terms of the comprehensive employment and training plan, the Secretary shall investigate the matter and make a determination within one hundred twenty days as to the validity of a complaint or the

extent and degree of noncompliance by a recipient.

The 120-day deadline thus originated as part of a provision whose purpose was to benefit the victims of prime sponsor non-compliance with CETA. *See also* S.Rep. No. 891, *supra,* at 15–16, 42–43, 80, 1978 U.S.Code Cong. & Ad.News at 4495, 4522–23, 4560. It was not designed to give prime sponsors immunity for misuse of CETA funds unless there was a final determination within 120 days.

Like the Senate bill, the House Committee bill required prime sponsors to set up formal grievance procedures; the House Committee bill also required the Secretary to act "whenever the Secretary has reason to believe (because of an audit, report, on-site review, or otherwise) that a recipient of financial assistance under this Act is failing to comply with the requirements of this Act ..." as well as after an appeal from a grievance denied by the prime sponsor. However, unlike the Senate's version, the House Committee bill did not impose fixed deadlines for making determinations on the merits of grievances filed pursuant to the new procedures.[5] The 120-day deadline for action by the Secretary was added in a floor amendment proposed by Representative Obey which added to the House version of § 106 deadlines like those in the Senate's version: the language in § 106(a) of the House Committee bill requiring that decisions by prime sponsors on grievances be "promptly made" was replaced by a requirement that such decisions be made within 60 days, and the sentence requiring a determination by the Secretary not more than 120 days after receipt of the complaint was inserted in § 106(b). 124 Cong.Rec. 25,230. It is noteworthy that, while the unamended version of § 106(b) imposed a duty on the Secretary to investigate *either* upon receipt of a complaint *or* when he has reason to believe from other sources that there has been a violation of CETA, Representative Obey's amendment referred only to "receiving the complaint," an omission entirely consistent with the primary reason for imposing a deadline—to assure complainants a prompt resolution of their complaints. That the running of the deadline was not intended to let non-complying prime sponsors escape the consequences of their non-compliance is made unmistakably clear from the discussion on the floor of the House:

> Mr. OBEY. Mr. Chairman, I understand that this amendment will be accepted by the committee. It is a very simple amendment. All it does is to put a specific period of time in the bill during which the prime sponsor must answer a complaint lodged against it for violations of the conditions under which the CETA program exists in the first place, and also it establishes a 120-day time limit on the time during which the Labor Department can consider a complaint before it has to proceed.

> Mr. HAWKINS. Mr. Chairman, will the gentleman yield?

---

5. The House Committee version provided in § 106:

(a) Each recipient of financial assistance under the Act shall establish and maintain a grievance procedure, including provisions for hearings within 30 days after filing of a grievance, for handling complaints about the program arising from its participants, subgrantees, and contractors, and other interested persons. Hearings shall be conducted expeditiously and decisions shall be promptly made. With the exception of grievances alleging fraud or any criminal activity, filing of a grievance must be made within one year of the alleged occurrence.

(b) Whenever the Secretary receives a complaint from any interested person or organization (which has exhausted the prime sponsor's grievance system established pursuant to subsection (a)) which alleges, or whenever the Secretary has reason to believe (because of an audit, report, on-site review, or otherwise) that a recipient of financial assistance under this Act is failing to comply with the requirements of this Act, the regulations under this Act, or the terms of the comprehensive employment and training plan, the Secretary shall investigate the matter. If, after such investigation, the Secretary determines that there is substantial evidence to support such allegations or belief that such a recipient is failing to comply with such requirements, the Secretary shall, after due notice and opportunity for a hearing to such recipient, determine whether such allegation or belief is true.

Mr. OBEY. I yield to the gentleman from California (Mr. HAWKINS).

Mr. HAWKINS. Mr. Chairman, we have seen the amendment. We accept the amendment.

*If the gentleman would further yield, do I understand from the gentleman from Wisconsin (Mr. OBEY) that if the determination is not made in a specified time it shall not affect the Secretary's jurisdiction in the matter?*

Mr. OBEY. That is correct.

Mr. HAWKINS. With that understanding we do accept the amendment. 124 Cong.Rec. 25,230–31 (emphasis supplied).[6]

The bills passed by the House and Senate differed in numerous respects, leading to a conference. 124 Cong.Rec. 31,059, 33,078. The conference agreed on a version of § 106 which, with differences that are not pertinent here, adopted the House version of § 106(b), including the Obey amendment. The conferees issued an identical statement to both Houses of Congress which simply describes the provision and does not indicate that any substantive change was thought to have been made at the conference. *See* H.R.Conf.Rep. No. 1765, 95th

Cong., 2d Sess. 117, 123 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4581, 4588; S.Conf.Rep. No. 1325, 95th Cong., 2d Sess. 117, 123 (1978).[7]

The decisions of the Third and Ninth Circuits cited above, *Lehigh Valley Manpower Program, supra,* 718 F.2d 99, *City of Edmonds, supra,* 749 F.2d 1419, and *Pierce County, supra,* 759 F.2d 1398 holding that under § 106(b) the Secretary has no authority to seek repayment more than 120 days after he learns of a possible violation, do not persuade us. The Third Circuit failed to consider the many cases, cited at the outset of our discussion, holding that a statutory time period requiring that administrative action be taken within a certain time does not bar later action by the Government unless the statute makes clear that this shall be the consequence. Indeed, as shown in detail in the margin,[8] none of the cases cited in Judge Weis' opinion for the Third Circuit to support the holding that further administrative action was barred dealt with the question here presented—the effect of a time limit on administrative action by the sovereign. The Third Circuit opinion also made no

---

**6.** Representative Hawkins was among the sponsors of the House bill to amend the 1973 CETA, a member of the committee to which the bill was referred and the floor manager during the House debate.

**7.** The Conference Report explained:

The conference agreement provides that each recipient of funds under the Act shall establish formal and informal grievance procedures for resolving complaints pertaining to the conditions and terms of employment of CETA participants employed by such recipient. Prime sponsors would establish grievance procedures for resolving complaints pertaining to the terms and conditions of employment of CETA participants employed by the prime sponsor as well as any other complaint about the program arising from its participants, subgrantees, contractors or other interested parties. Recipients of funds under the Act and national contractors would resolve a complaint within 60 days of its receipt. Upon exhaustion of local remedies, a complainant would be premitted [sic] appeal to the Secretary of Labor who would make a determination on the validity of the complaint within 120 days of its receipt.

H.R.Conf.Rep. No. 1765, *supra,* at 123, 1978 U.S.Code Cong. & Ad.News at 4588.

**8.** Three of the five cases cited, *United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974); *Kelly v. Railroad Retirement Bd.,* 625 F.2d 486, 491–92 (3 Cir. 1980); and *Neal v. Secretary of Navy,* 639 F.2d 1029, 1035–36 (3 Cir.1981), did not involve statutory deadlines at all. The two remaining cases, *Mohasco Corp. v. Silver,* 447 U.S. 807, 815–26, 100 S.Ct. 2486, 2491–97, 65 L.Ed.2d 532 (1980) (failure of discharged employee to file claim with EEOC within the 300 days required by § 706(e) of the Civil Rights Act of 1964 bars claim); and *School District of City of Allentown v. Marshall,* 657 F.2d 16, 19–21 (3 Cir.1981) (failure of employee to file complaint with the Secretary of Labor alleging retaliation by employer in violation of the Toxic Substances Control Act within the 30 days prescribed by 15 U.S.C. § 2622(b) bars claim), did involve statutory deadlines, but in both the party held to be barred by the failure to take timely action was an aggrieved individual and not a Government agency.

reference to the critical exchange between Representatives Hawkins and Obey on the floor of the House wherein Representative Obey's amendment was accepted only on the understanding "that if this determination is not made in a specified time it shall not affect the Secretary's jurisdiction in the matter."

 The Ninth Circuit, on the other hand, did consider the rule that a statutory deadline does not bar action by the Government unless it so specifies, citing its own decisions in *Marshall v. Local Union No. 1374, supra,* 558 F.2d at 1357, and *Fort Worth Nat'l Corp., supra,* 469 F.2d at 58. It concluded that these decisions had been overruled *"sub silentio"* by the Supreme Court in *Mohasco Corp., supra,* 447 U.S. at 825–26, 100 S.Ct. at 2496–97. *City of Edmonds, supra,* 749 F.2d at 1423. However, as previously pointed out, in *Mohasco* an aggrieved individual and not a Government agency was barred by failure to take timely action; the principle that disfavors sacrificing the public interest because of the negligence of public officers thus was not applicable. While the Ninth Circuit opinion also considered the discussion between Representatives Hawkins and Obey, Judge Alarcon concluded:

> We are not persuaded by the Department of Labor's reliance on Congressman Obey's comments that we should abandon our judicial responsibility to give plain mandatory language its ordinary meaning. We see no principled reason to create an intercircuit conflict on the meagre showing made by the Department of Labor in support of its reading of section 816(b).

749 F.2d at 1422. To the contrary, in our view, the language of the statute does *not* mandate dismissal of an action by the Secretary to recover misused funds because a final determination was not made within 120 days; the statute does not specify what the consequences of such a failure shall be, and the long recognized rule, not altered by *Mohasco,* is that under such circumstances later action is not barred. While this would be sufficient, inquiry into the legislative history shows that the primary purpose of the deadline was to insure an expeditious remedy for CETA program *beneficiaries* who had been denied CETA benefits due to misuse of funds by prime sponsors, and that one House of Congress stipulated that the deadline should not affect the Secretary's jurisdiction.[9] Under such circumstances, as in *Usery v. Whitin Mach. Works, Inc., supra,* 554 F.2d at 503, "[i]t would be ironic indeed," to hold that Congress' concern for speedy resolution of complaints was to be at the expense of the persons for whose benefit § 106(b) was enacted.[10]

9. Indeed, if one looked only at the language of § 106(b), as illuminated by the legislative history, it could be strongly argued that the 120-day provision has no application at all to an investigation of a prime sponsor at the instance of the Secretary: the 120-day provision runs only from receipt of "the complaint," and the first sentence of § 106(b) uses the word "complaint" only in connection with complaints from outsiders, and in contradistinction to "whenever the Secretary has reason to believe (because of an audit, report, on-site review or otherwise)" that a prime sponsor has violated CETA's requirements. However, the regulations promulgated by the Secretary have applied the 120-day deadline in § 106(b) to "receipt of a final audit or investigative report in the absence of a complaint," 20 C.F.R. § 676.88(e). Agreeing in this respect only with *Lehigh Valley Manpower Program v. Donovan, supra,* 718 F.2d at 101, and *Pierce County v. United States Dep't of Labor, supra,* at 1401, we accept this as a reasonable interpretation of the statute. Of course, the Secretary's interpretation of the deadline as applicable to investigations triggered by audits as well as by outsiders' complaints does not heighten the effect of the deadline.

10. *Usery* involved the Trade Act of 1974, under which workers laid off because of the increased importation encouraged by the Act qualified for economic assistance. The court was called upon to decide whether the Secretary's failure to determine eligibility within the 60 days which § 223 of the Act, 19 U.S.C. § 2273(a), states that the determination "shall" be made, precluded further action by the Secretary to obtain information relating to eligibility from an employer. Chief Judge Coffin concluded that "the Secretary is not ousted of jurisdiction by reason of his failure to make an eligibility determination within 60 days...." 554 F.2d at 503. After stating the rule that a statutory deadline does not bar the Government unless it expressly specifies this consequence, *id.* at 501, Chief Judge

## II. *The Secretary's Authority to Order Repayment as a Remedy*

The Tribe argues that if the Secretary's finding of its use of grant moneys in violation of CETA was not time-barred, the portion of his order directing repayment still cannot stand. This contention rests on two propositions: (1) that the Secretary had no authority under the 1973 CETA to order direct repayment by prime sponsors from non-CETA funds, his remedy being restricted to offsetting disallowed expenses against future CETA payments, and (2) that the provisions of the 1978 CETA which expressly authorized him to order repayment [11] should not be applied retroactively to grants which, like these here at issue, were made prior to 1978. The Secretary contends that he did have authority to order repayment under the 1973 Act, and, alternatively, that he has a common-law right to recover misspent funds in CETA administrative proceedings. Since we hold there was authority to order direct repayment under the 1973 Act, we need not reach the issues of the 1978 Act's retroactivity or the Government's common-law rights.

Relying on *Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), the Secretary finds statutory authority to order repayment in the language of § 602(b) of the 1973 CETA, 87 Stat. 878, which authorizes him to make "necessary adjustments in payment on account of overpayments and underpayments." [12] In *Bell,* the Secretary of Education sought repayment from the States of New Jersey and Pennsylvania for misuse of federal grants under the Elementary and Secondary Education Act (ESEA), Pub.L. No. 89–10, 79

---

Coffin found that "[t]he contrary result ... is not only inconsistent with established principles; it produces a result which we find impossible to square with the remedial objectives of the Act," *id.* at 502.

**11.** The 1978 Act provided in § 106(d), 29 U.S.C. § 816(d) (emphasis added):

(1) If the Secretary concludes that any recipient of funds under this Act is failing to comply with any provision of this Act or the regulations under this Act or that the recipient has not taken appropriate action against its subcontractors, subgrantees, and other recipients, the Secretary shall have the authority to terminate or suspend financial assistance in whole or in part and order such sanctions or corrective actions as are appropriate, *including the repayment of misspent funds from sources other than funds under this Act* and the withholding of future funding, if prior notice and an opportunity for a hearing have been given to the recipient. Whenever the Secretary orders termination or suspension of financial assistance to a subgrantee or subcontractor (including operators under a non-financial agreement), the Secretary shall have authority to take whatever action is necessary to enforce such order, including action directly against the subgrantee or subcontractor, and an order to the primary recipient that it take such legal action, to reclaim misspent funds or to otherwise protect the integrity of the funds or ensure the proper operation of the program.

(2) If the Secretary concludes that a public service employment program is being conducted in violation of section 121(e)(2), (e)(3),

(g)(1), section 122(c), (e), or section 123(g), or regulations promulgated pursuant to such sections, *the Secretary shall, pursuant to paragraph (1) of this subsection, terminate or suspend financial assistance in whole or in part, order the repayment of misspent funds from sources other than funds under this Act or other funds used in connection with programs funded under this Act (unless, in view of special circumstances as demonstrated by the recipient, the Secretary determines that requiring repayment would not serve the purposes of attaining compliance with such sections), and order such other sanctions or corrective actions as are appropriate.*

**12.** In its entirety, § 602(b) provided:

The Secretary may make such grants, contracts, or agreements, establish such procedures (subject to such policies, rules, and regulations as he may prescribe), and make such payments, in installments and in advance or by way of reimbursement, or otherwise allocate or expend funds made available under this Act, as he may deem necessary to carry out the provisions of this Act, including (without regard to the provisions of section 4774(d) of title 10, United States Code) expenditures for construction, repairs, and capital improvements, and including necessary adjustments in payments on account of overpayments or underpayments. The Secretary may also withhold funds otherwise payable under this Act, but only in order to recover any amounts expended in the current or immediately prior fiscal year in violation of any provision of this Act or any term or condition of assistance under this Act.

Stat. 27 (1965), 20 U.S.C. §§ 2701–3386 (as amended). ESEA created a program to improve educational opportunities for disadvantaged children that is similar to CETA in many respects: local educational agencies obtain grants from state agencies, which, in turn, obtain grants from the Department of Education upon providing assurances that the local agencies will spend the funds only on qualifying programs. As originally enacted, ESEA, like CETA, did not expressly provide for the repayment of misspent funds, but did provide that in disbursing payments under the Act the Secretary should

> take into account the extent (if any) to which any previous payment to such State educational agency under this title (whether or not in the same fiscal year) was greater or less than the amount which should have been paid to it.

§ 207(a)(1), 79 Stat. 32 (quoted in *Bell, supra,* 461 U.S. at 782). Congress amended ESEA in 1978, as it amended CETA, and made explicit the Secretary's authority to recover funds misused by a recipient. *See* Education Amendments of 1978, Pub.L. No. 95–561, § 185(b), 92 Stat. 2143, 2190 (codified at 20 U.S.C. § 2835(b)). The States challenged the Secretary's authority to recover funds misspent between 1967 and 1973, arguing, like appellant here, that no authority to demand repayment existed prior to 1978 and that the 1978 amendments operated prospectively only.

The Court, in an opinion by Justice O'Connor, readily ruled in favor of the Government. She found that "[t]he plain language of the statute recognizes the [Government's] right" to recover misspent funds because no other plausible reading would explain the meaning of the statutory command to "take into account the extent (if any) to which any previous payment"

was too large. *Id.* at 783 & n. 8, 103 S.Ct. at 2193 & n. 8.[13] She examined the legislative history and concluded that it "supports this natural reading." *Id.* at 783–84 & n. 9, 103 S.Ct. at 2193–94 & n. 9. Justice O'Connor also placed reliance on the fact that "[t]he Department [of Education] has long held our view of the statute, for it often sought repayment of misused funds." *Id.* at 786–87, 103 S.Ct. at 2194–95. Finally, she relied for "persuasive value" on the support of later Congresses, placing particular emphasis on statements from the legislative history of the 1978 amendments to ESEA that reflected the understanding that authority to order repayment already existed. *Id.* at 785, 789–90, 103 S.Ct. at 2194, 2196–97. In response to the State's argument that this interpretation of the earlier provisions of ESEA rendered the 1978 amendment redundant, Justice O'Connor explained that the 1978 amendments were intended to clarify the Secretary's authority by "specifying the procedures to be followed in the determination of the amount of the debt and in the collection of the debt." *Id.* at 788–89, 103 S.Ct. at 2195–96.[14]

Relying on *Bell,* the Third Circuit in *Atlantic County v. United States Dep't of Labor,* 715 F.2d 834, 836 (3 Cir.1983) (per curiam), and the Fourth Circuit in *North Carolina Comm'n of Indian Affairs v. United States Dep't of Labor,* 725 F.2d 238, 240–41 (4 Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984), concluded that the Secretary had authority to order direct repayment of misspent funds under the 1973 CETA. These decisions were followed in *Texarkana Metropolitan Area Manpower Consortium v. Donovan,* 721 F.2d 1162, 1164 (8 Cir.1983) (per curiam); *California Tribal Chair-*

---

**13.** The State of New Jersey argued that this language only entitled the Secretary to reduce grants below the amount that the State would be eligible to receive while the State undertook a smaller program. The Court rejected this argument, noting that "it is hardly likely that Congress intended disadvantaged children to suffer twice: once when the State misspent the funds and once when the State cancels an other-

wise eligible program because of the Secretary's refusal to fund it." 461 U.S. at 783 n. 8, 103 S.Ct. at 2193 n. 8.

**14.** Justice White, concurring, joined the Court's opinion, but stated that he would have preferred to place decision on the ground that the 1978 amendments should be applied retroactively. 461 U.S. at 793–94, 103 S.Ct. at 2198–99.

*man's Ass'n v. United States Dep't of Labor,* 730 F.2d 1289, 1291 (9 Cir.1984); *Mobile Consortium of CETA Alabama v. United States Dep't of Labor,* 745 F.2d 1416, 1418 (11 Cir.1984). None of these cases dealt with an argument, which also has not been made by the Tribe here, that could have been made on the basis of footnote 4 of the *Bell* opinion, which we quote in the margin,[15] that *Bell* addressed only the question whether the Government had a *right* under ESEA to recover misspent funds and not the available *remedies. Cf. Maryland Dep't of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1453–1462 (D.C.Cir. 1985) (finding that *Bell* does not include remedies available in context of misspent federal grants under title XX of the Social Security Act). However, any possible doubt on that score was dispelled when the Supreme Court, again speaking through Justice O'Connor, approved a repayment order by the Department of Education for misspending ESEA funds provided in 1974. *Bennett v. Kentucky Dep't of Education,* — U.S. —, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985).[16]

▮▮▮ Even without *Bell* and *Bennett,* the history and administrative background of the 1973 Act require the conclusion that the Secretary had authority under the 1973 CETA to order repayment of misspent funds by prime sponsors. CETA replaced the Manpower Development and Training Act, Pub.L. No. 87–415, 76 Stat. 23 (1962), the Economic Opportunity Act of 1964, Pub.L. No. 88–452, 78 Stat. 508 (1964), and the Emergency Employment Act of 1971, Pub.L. No. 92–45, 85 Stat. 146 (1971). *See* 1973 CETA, § 3, 87 Stat. 839. Like the 1973 CETA, these earlier acts contained no provisions expressly authorizing orders for repayment of misused funds and provided only for adjustment or withholding of payments. However, as noted by the Third Circuit in *Atlantic County, supra,* in administering these programs, the Secretary of Labor had "been auditing grantees, disallowing costs and recovering misspent funds over a considerable period of time." 715 F.2d at 836 (citing cases); *see also North Carolina Comm'n of Indian Affairs, supra,* 725 F.2d at 242 ("Although the earlier laws provided no express right of recoupment, the Secretary of Labor routinely audited grantees, disallowed costs and recovered misspent funds"). The provisions of the 1973 CETA on which the Secretary bases his authority to order repayment were lifted directly from these earlier statutes. *See, e.g.,* Economic Opportunity Act of 1964, § 602(n), 78 Stat.

**15.** New Jersey seems to take the view that the Secretary has settled the method of collection by demanding repayment. In fact, the record shows that each State received notice of the Board's decision, stating: "[The State] should refund [the amount] to the Department of Education. Appropriate authorities within the Department will be in touch with you at an early date to discuss the method of repayment of the funds in question."

New Jersey has reproduced as an appendix to its brief a letter demanding immediate repayment, suggesting that the Secretary has already determined the manner of collection. That letter is not part of the record, and we are inclined, in any event, to view it as an initial proposal of a means of collection. Cf. 4 CFR § 102.2 (1983) (regulation under Federal Claims Collection Act, Pub.L. 89–508, § 3, 80 Stat. 309, 31 U.S.C. § 952, requiring agency to make written demand for repayment in attempting collection of claims). Moreover, the Secretary, who is the petitioner, has not asked us to decide what means of collection are available to him, but only whether he is a creditor. *Since the case does not present the issue of available remedies, we do not address it.*

461 U.S. at 779 n. 4, 103 S.Ct. at 2191 n. 4 (citations omitted) (emphasis added).

**16.** The issue in *Bennett v. Kentucky Dep't of Education* was whether bad faith on the part of the State was required before the Secretary could seek recovery of misspent funds. In finding that it was not, Justice O'Connor did not discuss the use of repayment as opposed to some other remedy, and apparently assumed that a repayment order was proper. Obviously she was well aware of the opinion she had authored in *Bell* a scant nine months earlier, particularly since the companion case, *Bennett v. New Jersey,* — U.S. —, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), which she also authored, was the same case as *Bell* following the decision of the Third Circuit on remand. We therefore have little difficulty in reading *Bennett's* silence as approval, if, indeed, anything more was required after *Bell.*

530 (allowing administrator to make "necessary adjustments on account of overpayments or underpayments"); Emergency Employment Act of 1971, § 12(e), 85 Stat. 154 (identical to 1973 CETA § 602(b)). It is well established that "where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *see also* 2A Singer, Sutherland's Statutory Construction § 49.09 (Sands 4th ed. 1984).

■ Moreover, there is nothing to suggest, as the Tribe argues, that the few remedies expressly provided in the 1973 Act were intended to be the sole and exclusive remedies available to the Secretary to secure compliance with the requirements of CETA. These remedies, which are contained in provisions describing the Secretary's powers in approving plans and disbursing funds, are limited to withholding or adjusting future payments, §§ 108(b)(2), 602(b), 87 Stat. 847, 878, and terminating the prime sponsor's plan, *id.* § 108(d), 87 Stat. 847–48. That Congress was concerned that the Secretary should insure that prime sponsors comply with the conditions under which they obtain CETA grants is evidenced by § 105(b), 87 Stat. 844, which requires prime sponsors to certify that their plans meet the Act's requirements, and by § 613, 87 Stat. 882, which authorizes the Secretary to audit sponsors "[i]n order to assure that funds provided under this Act are used in accordance with its provisions ...." It is unlikely that Congress would have limited available sanctions to offset or withholding of future payments on the one hand, and complete revocation of the program on the other. It is still more unlikely that Congress would have left no remedy at all for cases in which, although substantial sums of money have been misspent, there are no further funds to be withheld because of program termination. A more reasonable conclusion is that Congress left it to the Secretary to establish additional remedial procedures, consistent with the purposes of the legislation, to insure compliance by prime sponsors. The House Report summarized the supervisory role envisioned for the Federal Government by stating:

> In short, the Secretary is expected to adopt administrative procedures for looking behind the certification of compliance of prime sponsors required by section [105(b)] that their plans meet the requirements of the section and that they will comply with all of the provisions of the Act, in order to assure that the requirements are being met.... Section [108(b)(2)] spells out the action to be taken by the Secretary upon receipt of a formal allegation from an affected unit of general local government that a prime sponsor is not complying with section [105], among other sections of the Act. However, the Committee does not intend that such formal allegation shall be the only means by which the Secretary assures himself of compliance with the Act, or is the only allegation of noncompliance which he would use as the basis for appropriate action to assure compliance.... It is the intent of the Committee that the Secretary has ultimate responsibility for assuring that manpower programs and policies are carried out in accordance with the purposes and provisions of the Act.

H.R.Rep. No. 659, 93d Cong., 1st Sess. 9 (1973), *reprinted in* 1973 U.S.Code Cong. & Ad.News 2935, 2942. Similarly, Representative Perkins, a sponsor of the bill and member of the House subcommittee that studied it, explained:

> This bill is a compromise between those who favor the so-called revenue-sharing approach and those who believe in a strong Federal role and responsibility. The compromise was to decentralize the planning and administration of manpower programs to State and local governments, but to require a careful Federal review and approval of the local plans and to place squarely with the Secretary of Labor the responsibility for seeing that the conditions and special require-

ments of the law, as well as its general purposes, are in fact being carried out. The ultimate responsibility for success or failure rests with the Secretary and we will hold him strictly accountable.

119 Cong.Rec. 42,877. *See also id.* at 25,-709 (statement of Sen. Javits).

■ Finally, the Secretary consistently interpreted the 1973 Act as authorizing him to order repayment of misspent funds. *See, e.g., In re Vermont Offices of Manpower Services,* 76–CETA–103 (ALJ Feb. 25, 1976; Secretary Nov. 23, 1976); *In re Town of Burrillville,* 76–CETA–109, –110 (ALJ Nov. 10, 1976; Secretary May 2, 1978); *In re Bd. of County Comm'rs, Allen County,* 77–CETA–103 (ALJ Sept. 16, 1977); *In re Florida Farmworkers Council, Inc.,* 77–CETA–105 (ALJ Jan. 26, 1978); *In re Associated City-Council Economic Development Corp.,* 78–CETA–114 (ALJ Sept. 15, 1978). It scarcely needs repeating that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...," *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234–35, 53 L.Ed.2d 100 (1977) (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)), and that "[p]articularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)).

The Tribe argues that "if authority to require repayment existed in the 1973 Act, then the 1978 provision would be redundant." The 1978 Act entailed more than the insertion of some new language; Congress substituted an entirely new bill, incorporating new provisions along with rewritten versions of provisions from the 1973 Act, in order to "expand[ ] and clarif[y] existing law," S.Rep. No. 891, *supra,* at 16, 1978 U.S.Code Cong. & Ad.News at 4495. There is little doubt that Congress was aware of the Secretary's use of repayment orders under the 1973 Act. Ernest Green, Assistant Secretary of Labor, and Lawrence Rogers, Director of the Department's Office of Field Operations, testified at length about the Department's practice of ordering direct repayment in certain instances. *See* House Hearings, *supra,* at 772–78. Examples of past efforts by the Secretary to collect misspent CETA funds by ordering repayment also were frequently mentioned on the floor of the Congress; the consensus being that these efforts were inadequate. *See, e.g.,* 124 Cong.Rec. 25,168 (statement of Rep. Hawkins), 25,221 (statement of Rep. Cornell), 31,021 (statement of Rep. McGuire), 31,026 (statement of Rep. Collins). As noted above, strengthening the Secretary's enforcement powers was an important consideration in the new act. It is thus not surprising that in drafting the much more extensive and detailed provisions setting out the Secretary's authority, Congress chose to make the Secretary's power to order repayment express.[17]

■ The Tribe argues finally that any authority to seek repayment "was lost when CETA was repealed in 1982 by the Job Training Partnership Act of 1982

---

**17.** The Tribe points to an exchange between Senators Schweiker and Javits as evidence that the 95th Congress thought that the provisions authorizing repayment were new. Senator Schweiker proposed an amendment, which became § 106(d)(2), to limit the broad discretion to order repayment provided in subparagraph (d)(1) by *requiring* a repayment order for certain enumerated violations of CETA unless "special circumstances" exist. In response to a question from Senator Javits, Senator Schweiker replied that the amendment was not intended to be retroactive because "enforcement standards and policy should be clear in advance." 124 Cong.Rec. 27,803–04. However, Senator Schweiker was referring to limiting the Secretary's discretion *not* to order repayment in certain instances, which was new in 1978, and not to providing the Secretary with authority to order repayment, which was not.

[ (JTPA), Pub.L. No. 97–300, § 184, 96 Stat. 1322, 1357–58]." However, the JTPA contains a savings clause that specifically preserves the Secretary's authority under CETA in certain cases. JTPA § 181, 96 Stat. 1354–57. Subsection (d) of § 181 preserves "[a]ll … determinations … which have been issued under the Comprehensive Employment and Training Act … on or before September 30, 1983" and provides that these "shall continue in effect until modified or revoked by the Secretary, by a court of competent jurisdiction, or by operation of law other than [the JTPA]." The Grant Officer's final determination was issued on September 28, 1981, well before the cutoff date of September 30, 1983. Alternatively, subsection (e) states that "[t]he provisions of [the JTPA] shall not affect administrative or judicial proceedings pending on October 13, 1982, or begun between October 13, 1982, and September 30, 1984, under the Comprehensive Employment and Training Act." Administrative proceedings in this case were initiated on October 13, 1981, when the Tribe requested a hearing before an ALJ to challenge the Secretary's final determination; the hearing was held on December 17, 1982. The administrative proceedings were thus "pending on October 13, 1982, or begun between October 13, 1982, and September 30, 1984," and hence were not affected by passage of the JTPA.

The petition to review is denied.